0NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

MARY B., CHRISTOPHER W., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY[1], L.B., M.W., *Appellees*.

No. 1 CA-JV 14-0236
FILED 7-9-2015

---

Appeal from the Superior Court in Mohave County
No. L8015JD201207011
The Honorable Richard D. Lambert, Judge

**AFFIRMED**

---

COUNSEL

Law Office of Daniel DeRienzo, PLLC, Prescott Valley
By Daniel J. DeRienzo
*Counsel for Appellant Mary B.*

---

[1]    Pursuant to S.B. 1001, Section 157, 51st Leg., 2nd Spec. Sess. (Ariz. 2014) (enacted), the Department of Child Safety is substituted for the Arizona Department of Economic Security in this matter.  *See* ARCAP 27. In the text of our decision, we refer to the agencies that were involved at the relevant times.

Law Offices of Heather C. Wellborn, P.C., Lake Havasu City
By Heather C. Wellborn
*Counsel for Appellant Christopher W.*

Arizona Attorney General's Office, Mesa
By Amanda Adams
*Counsel for Appellee DCS*

---

## MEMORANDUM DECISION

Judge Peter B. Swann delivered the decision of the court, in which Presiding Judge Randall M. Howe and Judge Andrew W. Gould joined.

---

**S W A N N**, Judge:

**¶1**        Mary B. ("Mother"), parent of L.B. and M.W. ("the Children"), and Christopher W. ("Father"), parent of M.W., appeal the juvenile court's order terminating their parental rights.[2]   We affirm because reasonable evidence supports the termination order.

### FACTS AND PROCEDURAL HISTORY

**¶2**        In November 2012, the Arizona Department of Economic Security ("DES") removed the Children from Mother and Father's care and filed a dependency petition, alleging that Mother's home was "filthy" and that she had neglected the Children due to mental illness, substance abuse, and failure to protect the Children from sexual abuse.[3]   DES also visited Father's home and alleged that he had neglected M.W. due to an unfit home.   Later that month, Mother and Father came to an agreement with DES and consented to place the Children in the physical custody of four-year-old L.B.'s paternal grandmother ("Grandmother").

**¶3**        In February 2013, the court found the Children dependent as to Mother and found M.W. dependent as to Father.   The court ordered that the Children be placed back in the temporary physical custody of Mother and Father.

---

[2]      L.B.'s father is not a party to this appeal.

[3]      The sexual abuse allegations were later determined to be unsubstantiated.

¶4        About one week after the Children were placed in the temporary physical custody of Mother and Father, Mother called Grandmother and said she needed to return the Children to her.  When the Children came back into Grandmother's care, they were both very hungry and dehydrated, and they began hoarding food.  M.W. had little to no sleep the entire time he was with Mother and Father, which Mother tried to remedy with Nyquil, and he had a temperature of over 104 degrees.  Grandmother sought out medical attention for M.W. and stated that she was afraid he was going to die.  Mother later told Grandmother that during the time they were in her care, the Children did not have anything to eat other than applesauce.  Mother then went to the DES office and informed the case manager that she had returned the Children to Grandmother because Father had raped her while she was asleep, and that she had moved out of the home and was living in a homeless shelter.

¶5        DES referred both parents to mental health counseling, parenting classes and supervised visits with the Children.  Mother completed parenting classes and could "explain what she learned in the class[,] but [was] not showing that she [could] apply what she ha[d] learned during supervised visits."  In July 2013, the case manager reported that the visits were going well as long as Mother's mother was there to help her.  However, by October 2013, the case manager noted that visits between Mother and the Children were not going well. She stated that Mother did not want to take direction from the parent aide and could not appropriately parent the Children.

¶6        Father also completed parenting classes and attended monthly counseling sessions.  The DES case manager stated that M.W. seemed to be bonded with Father and the supervised visits went very well.  After the rape allegations Mother had made against Father were determined to be unsubstantiated, DES again attempted to reunify M.W. with Father, stating that if he maintained employment, obtained appropriate housing, and Father's mother was not living in the home, M.W. would be transitioned back into Father's care.  The case manager specifically stated that Father's mother was not to have unsupervised visits with M.W. because of her prior history with DES.

¶7        Eventually, Father completed his case plan and transitioned into unsupervised visits with M.W.  However, the case manager stated that there were concerns about Father's mother living in the home with him, and as long as she was in the home the home was not suitable.  The case manager also noted that "[f]or overnight visits to commence[,] the paternal grandmother must be moved out of the house."  Father continued to reside with his mother.

¶8        In January 2014, the case manager received a phone call from Father stating that he had left M.W. at home with his mother because he had to

go pick up his girlfriend from high school. The case manager told Father that was inappropriate and immediately went to pick up M.W. from Father's house. She advised Father that he would be transitioning back to supervised visits. After this incident, Father stopped attending supervised visits and was closed out of those services by the parent aide company. However, the case manager and other case aides continued to schedule and supervise visits between Father and M.W. themselves. Overall, Father attended less than one-third of the scheduled visits.

¶9        In February 2014, DES filed a motion to terminate parental rights under A.R.S. § 8-533(B)(2) and -533(B)(8)(c) with respect to Mother and Father, and also under A.R.S. § 8-533(B)(3) with respect to Mother. The matter proceeded to a contested severance hearing.

¶10        At the hearing, evidence was presented that Mother was referred for and completed a psychological evaluation with Dr. Wagner. Dr. Wagner testified that Mother had a grade level of 4.7. He diagnosed Mother with borderline intellectual functioning and dependent personality disorder. At the time, Dr. Wagner did not think Mother was able to parent. He believed that without the services and treatment he recommended, the prognosis was "extremely poor," and even with the services, it was "probably guarded." He testified that it was difficult to see a change in borderline intellectual functioning and "we got what we got in terms of intellectual functioning of that nature." He further testified that personality disorders could be managed and redirected, but "it takes years of pretty intensive work . . . with a person to get some of those long-term alterations."

¶11        The case manager testified that during supervised visits, Mother "ha[d] difficulty maintaining appropriate behaviors with the children." She stated that Mother had trouble retaining and remembering what she learned with the parent aide during visits. For example, the case manager testified that on a visit with the Children to the library, L.B. had gone missing and when the parent aide mentioned to Mother that she was gone, Mother did not go and look for her. The parent aide had to go find L.B. and bring her back. The case manager testified that she did not believe Mother could safely watch the Children without another adult present.

¶12        The case manager also testified that she did not believe the Children could be returned to Mother "[p]artly [because of] her mental health issue and mostly because of the boyfriend that she's living with." According to the case manager, Mother would not tell the case manager her address because she did not want DES to investigate her boyfriend. Mother's boyfriend's parental rights were severed in 2011 for "[n]eglect, substance abuse, physical

abuse and allegations of sexual abuse." When the case manager told Mother that as long as her boyfriend was in the home, the Children would not be allowed there, Mother "did not understand why his rights being severed was a factor."

¶13        Additionally, the case manager testified that it was harmful to M.W. to have Father miss so many visits. She stated that the parent aides had to stop telling M.W. that he was having a visit "because he would get very upset if he got to the visit and dad didn't show up." She further testified that M.W. would cry, throw a temper tantrum, and wet his pants. The case manager stated that Father's mother still lived with him and "there's been a significant lack of participation in visits and [Child Family Team Meetings] since last year."

¶14        Ultimately, the court found the following grounds for termination by clear and convincing evidence. First, the court found that Mother and Father had neglected the Children, and failed to protect them from neglect under A.R.S. § 8-533(B)(2). Specifically, the court found that Mother and Father failed to provide adequate supervision while the Children were in their care, citing the incident that occurred in February 2013. Second, the court found that the Children had been in out-of-home placement for a cumulative total period of 15 months or longer under A.R.S. § 8-533(B)(8)(c), and that there had been a diligent effort to provide appropriate reunification services. The court found that Mother had participated in visitation and parenting classes but had not participated in mental health services from November 2013 to June 2014. Additionally, Father had "inconsistently and sporadically participated in visitation services and did not maintain communication with the case manager." Therefore, the court found that the parents had been unable to remedy the circumstances that caused the Children to be in out-of-home placement and there was a substantial likelihood that they would not be capable of exercising proper and effective parental care and control in the near future.

¶15        The court found additional grounds for terminating Mother's parental rights under A.R.S. § 8-533(B)(3), stating that Mother was unable to discharge her parental responsibilities due to mental illness and mental deficiency and there were reasonable grounds to believe that the condition would continue for a prolonged indeterminate period. The court stated that despite participation in some of the services offered, Mother remained unable to discharge her parental responsibilities and she "admits she cannot care for the children without assistance."

¶16        Additionally, the court found that the Department of Child Safety ("DCS"), which had succeeded to the case, had proven by a preponderance of the evidence that termination of the parent-child relationship was in the Children's best interests.

¶17        Father and Mother timely appeal.

## DISCUSSION

¶18        To terminate a parent-child relationship, the juvenile court must find by clear and convincing evidence that at least one of the grounds set forth in A.R.S. § 8-533(B) exists, and must find by a preponderance of the evidence that severance is in the child's best interests. *Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 41 (2005); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 12 (2000). We accept the court's findings of fact unless they are not supported by any reasonable evidence, and we will affirm the severance order unless it is clearly erroneous. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). We conclude that reasonable evidence supported the juvenile court's finding of the statutory grounds for severance and its finding that severance was in the Children's best interests.

I.        REASONABLE EVIDENCE SUPPORTS THE JUVENILE COURT'S FINDINGS CONCERNING SEVERANCE OF MOTHER'S PARENTAL RIGHTS.

   A.     Reasonable Evidence Supports the Juvenile Court's Finding That Severance of Mother's Parental Rights Was Warranted Under A.R.S. § 8–533(B)(3).

¶19        Mother asserts that DCS did not show by clear and convincing evidence that she was unable to discharge her parental duties due to mental illness or mental deficiency. She argues that Dr. Wagner "did not identify the responsibilities Mother was unable to discharge and failed to describe how the characteristics of her mental illness impaired her ability to carry out her parental duties."

¶20        Under A.R.S. § 8–533(B)(3), DCS was required to prove by clear and convincing evidence that Mother was unable to discharge her parental responsibilities because of mental illness or mental deficiency, and that there are reasonable grounds to believe that the condition will continue for a prolonged and indeterminate period. The record must show that Mother's mental illness "deprives [her] of the ability to effectively care for the [C]hild[ren]." *Maricopa Cnty. Juv. Action No. JS–6831*, 155 Ariz. 556, 558 (App. 1988). The evidence was sufficient to satisfy this burden of proof.

¶21        Dr. Wagner testified that Mother's dependent personality disorder gave her a tendency to become so dependent on others that she might sacrifice happiness and safety in order to maintain a relationship. He testified that Mother did not have the ability to control her impulses or regulate her anger and

he did not believe Mother was able to parent the Children. He also stated that he was concerned about her choice of male partners. Therefore, Dr. Wagner's testimony about these specific characteristics of Mother's mental illnesses provided sufficient evidence for the court to conclude that Mother's mental illnesses and deficiencies prevented her from discharging her parental responsibilities.

¶22            Further, Dr. Wagner specifically testified that without the treatment he recommended, the prognosis was "extremely poor," and even with the services, it was guarded. He testified that it was difficult to see a change in borderline intellectual functioning, and that personality disorders could be managed and redirected, but "it takes years of pretty intensive work . . . with a person to get some of those long-term alterations." Therefore, there was also sufficient evidence for the court to conclude that the condition would continue for a prolonged and indeterminate period.

¶23            Mother argues that the rehabilitative services recommended by Dr. Wagner were not offered to her and DES failed in its "duty to attempt rehabilitation."[4] "DES is not required to provide every conceivable service or to ensure that a parent participates in each service it offers." *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994). Furthermore, DES is not obligated to undertake futile rehabilitative measures; rather, it should only provide those that offer a reasonable possibility of success. *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 187, ¶ 1 (App. 1999). DES offered Mother mental health services; however, she "did not participate in the services offered at Mohave Mental Health from November 2013 to June 2014." We fail to see how Mother could have benefitted from additional services when she declined to participate in the basic mental health counseling offered to her for a prolonged period of time.

---

[4]      Dr. Wagner made multiple recommendations as a result of his examination of Mother, including: a reevaluation within six months with consideration of psychotropic medications, hair follicle testing, supervised visits with the Children, vocational rehabilitation, anger management, domestic violence and codependency classes, individual counseling, and consulting with a pain management specialist. Dr. Wagner qualified these recommendations by stating, "Typically . . . I'll try to make as many recommendations as I think would possibly be helpful in a case."

B.      Reasonable Evidence Supports the Juvenile Court's Finding That Severing Mother's Parental Rights Was in the Children's Best Interests.

¶24     Mother asserts that reasonable evidence does not support the juvenile court's finding that severing Mother's parental rights was in the Children's best interests.

¶25     To show that severance was in the Children's best interests, the court was required to determine "how the child would benefit from a severance *or* be harmed by the continuation of the relationship," *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990), by considering and balancing the totality of the evidence, *Maricopa Cnty. Juv. Action No. JS-9104*, 183 Ariz. 455, 461 (App. 1995), *abrogated on other grounds by Kent K.*, 210 Ariz. 279.  One relevant factor to the best-interests determination is whether the child would be at risk of abuse or neglect if placed in the parent's care. *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 238, ¶ 27 (App. 2011); *Linda V. v. Ariz. Dep't of Econ. Sec.*, 211 Ariz. 76, 80, ¶ 17 (App. 2005).  Other relevant factors include (but are not limited to) whether an adoptive placement is immediately available, whether the existing placement is meeting the child's needs, and whether the child is adoptable. *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 379, ¶ 30 (App. 2010).  Here, DCS presented evidence that the Children had been in out-of-home placement since November 2012, during which time Mother stopped participating in reunification services that were offered to her.  DCS also presented evidence that the Children's long-term placement, Grandmother, was willing to adopt them.

¶26     In view of this evidence, the juvenile court reasonably found that severance was in the Children's best interests because "the [C]hildren would derive the benefit of being in a home that would provide stability, safety, both emotionally, physically, and temporally."

C.      Mother Was Not Denied Due Process.

¶27     Mother argues that she was denied due process when the state failed to disclose evidence to her regarding the allegations against her boyfriend. Mother argues that "[t]o this day, no[ ]one knows why this was such an issue." Though Mother may disagree with the concerns about her boyfriend, she had the relevant information.  Mother knew that her boyfriend had a history with DES and that his own parental rights had previously been terminated.  She told a parent aide that she did not want DES to know who her boyfriend was for this very reason.  Additionally, Mother would not tell DES where she was living because she did not want DES to conduct an investigation into her boyfriend.

Mother cannot withhold information from DES and then argue that it acted improperly by failing to disclose that very information to her.

**¶28**        And while the case manager testified that she did not believe the Children could be returned to Mother, "[p]artly [because of] her mental health issue and mostly because of the boyfriend that she's living with," Mother's boyfriend was not the only issue.  Mother had consistently failed to make the behavioral changes necessary to parent the Children safely and was deriving little to no benefit from the reunification services offered to her.  Moreover, the court did not discuss Mother's continued relationship with her boyfriend as a factor in its decision to terminate her parental rights.  Because substantial justification existed to keep the Children in an out-of-home placement with or without Mother's continued relationship with her boyfriend, she has not shown that the nondisclosure of information about her boyfriend made this proceeding so fundamentally unfair as to result in a denial of due process.  *See Kent K.*, 210 Ariz. at 284, ¶ 24.

II.    REASONABLE EVIDENCE SUPPORTS THE JUVENILE COURT'S FINDINGS  CONCERNING SEVERANCE OF FATHER'S PARENTAL RIGHTS.

    A.    Reasonable Evidence Supports the Juvenile Court's Finding That Severance of Father's Parental Rights Was Warranted Under A.R.S. § 8-533(B)(2).

**¶29**        Father asserts that DCS failed to establish by clear and convincing evidence that he failed to protect M.W. from neglect.

**¶30**        Under § 8-533(B)(2), DCS was required to prove by clear and convincing evidence that Father neglected M.W. or failed to protect M.W. from neglect. Neglect is defined as "[t]he inability or unwillingness of a parent . . . of a child to provide that child with supervision, food, clothing, shelter or medical care if that inability or unwillingness causes unreasonable risk of harm to the child's health or welfare."  A.R.S.  § 8-201(24)(a).  The evidence was sufficient to satisfy this burden of proof.

**¶31**        Evidence was presented that during the brief period when the Children were in Mother and Father's temporary physical custody, Father would not give Mother food stamps or money to buy food for the Children.  During this period, "the [C]hildren often missed meals, were left unattended, and were treated with over-the-counter medications to make the [C]hildren sleep."  When M.W. was returned to Grandmother's care, he had an untreated fever of over 104 degrees.  Additionally, Father threatened to let the Children play in the street if Mother left them in his care.  Therefore, there was sufficient evidence to establish

that Father had neglected M.W. or failed to protect him from neglect, causing unreasonable risk of harm to M.W.'s health and welfare.

> B. Reasonable Evidence Supports the Juvenile Court's Finding That Severance of Father's Parental Rights Was Warranted Under A.R.S. § 8-533(B)(8)(c).

¶32 Under § 8-533(B)(8)(c), DCS was required to prove that M.W. had been in out-of-home placement for 15 months or longer pursuant to court order, that DES had made a diligent effort to provide appropriate reunification services to Father, that Father had been unable to remedy the circumstances that caused M.W. to be in out-of-home placement, and that there was a substantial likelihood that Father would not be capable of exercising proper and effective parental care and control in the near future. The evidence was sufficient to satisfy this burden of proof. The evidence showed that the Children had been in Grandmother's care for well over 15 months, and during that time Father was offered a variety of services designed to enable him to meet M.W.'s needs. And although Father successfully completed some of those services, he failed to participate in supervised visitation with M.W., still lived with his mother, and remained unemployed.

¶33 Father argues that DCS failed to establish that he substantially neglected or refused to remedy the circumstances causing M.W. to be in out-of-home placement. He asserts that "[t]he only reason why the State moved to terminate [Father's] parental rights was due to one [ ] instance wherein [Father] left the minor child in the care of his mother for [20 to 25] minutes."

¶34 While it is true that Father had completed his case plan and progressed to unsupervised visits, he then violated a court order and a DES directive not to leave M.W. with his mother. The case manager reported that the behavioral changes that Father must demonstrate included "maintain[ing] legal employment" and "provid[ing] safe housing by not allowing his mother and her significant other to remain living in the home." At the time of the severance hearing, Father was still living with his mother and had not obtained employment. Additionally, once supervised visits were reinstated, Father "attended less than one-third of those visits" which substantially harmed M.W.'s emotional health and well-being.

¶35 Father's attendance at fewer than one-third of his scheduled supervised visits with M.W., his failure to obtain employment, and his failure to obtain housing apart from his mother were sufficient to permit the court to find that he substantially neglected or refused to remedy the circumstances causing M.W. to be in out-of-home placement and that there is a substantial likelihood

that he will not be capable of exercising proper and effective parental care and control in the near future.

   C. Reasonable Evidence Supports the Juvenile Court's Finding That Severing Father's Parental Rights Was in M.W.'s Best Interests.

**¶36**    Finally, Father argues that DCS did not prove by a preponderance of the evidence that severance was in M.W.'s best interests. To show that severance was in M.W.'s best interests, the court was required to determine how M.W. would benefit from severance or be harmed by the continuation of the relationship with Father by considering the totality of the evidence. *See supra* Section I.B.

**¶37**    Here, DCS presented evidence that M.W. had been in out-of-home placement since November 2012, during which time Father had stopped participating in supervised visits with M.W., causing him to cry, throw temper tantrums, and wet his pants. DCS also presented evidence that M.W.'s long-term placement was willing to adopt him and his sister.

**¶38**    In view of this evidence, the juvenile court reasonably found that severance was in M.W.'s best interests because "a continued relationship with Father would be detrimental in that [M.W.] would be subjected to sporadic and inconsistent visits with his dad, which have already resulted in [M.W.] experiencing frequent disappointment and distress." The court found that although M.W. was not placed with a family member, he has a very close relationship with his sister and Grandmother and a placement with her was in his best interests. And M.W. "would derive an affirmative benefit from termination in that he would have emotional stability and physical and temporal care."

**CONCLUSION**

**¶39**    For the reasons set forth above, we affirm the juvenile court's order severing Mother's parental relationship with both Children, and Father's parental relationship with M.W.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama

11